UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARIA BULLARD,

       Plaintiff,

v.                                   CASE NO. 8:19-cv-289-T-23MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

       Defendant.
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative

decision regarding her January 6, 2016 application for a period of disability and

disability insurance benefits ("DIB").  Plaintiff was previously awarded DIB

starting January 15, 2010.  (*See* Tr. 12, 74-79.)  However, due to medical

improvement, on October 22, 2013, the Social Security Administration ("SSA")

ceased paying those benefits.  (Tr. 12.)  Plaintiff did not appeal the cessation

determination, which became administratively final.  (*Id.*)

On January 6, 2016, she filed a new application for a period of disability

---

[1] "Within 14 days after being served with a copy of [this Report and
Recommendation], a party may serve and file specific written objections to the proposed
findings and recommendations."  Fed.R.Civ.P. 72(b)(2).  "A party may respond to
another party's objections within 14 days after being served with a copy."  *Id.*  A party's
failure to serve and file specific objections to the proposed findings and
recommendations alters the scope of review by the District Judge and the United States
Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge
anything to which no specific objection was made.  *See* Fed.R.Civ.P. 72(b)(3); 28
U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; M.D. Fla. R. 6.02.

and DIB, alleging disability beginning January 15, 2010.  (*Id.*)  Following an

administrative hearing held on February 20, 2018, the assigned Administrative

Law Judge ("ALJ") issued a decision,[2] finding Plaintiff not disabled from October

23, 2013, the date following the cessation of benefits, through April 11, 2018, the

date of the ALJ's decision.[3]  (Tr. 12-25, 37-70.)

Plaintiff is appealing the Commissioner's decision that she was not

disabled from October 23, 2013 through April 11, 2018.  Plaintiff has exhausted

her available administrative remedies and the case is properly before the Court.

Based on a review of the record, the briefs, and the applicable law, the

undersigned **RECOMMENDS** that the Commissioner's decision be **AFFIRMED.**

## I.    Standard of Review

The scope of this Court's review is limited to determining whether the

---

[2] The ALJ stated in relevant part:
The claimant, by alleging a disability commencing January 15, 2010, has impliedly requested reopening of both the FULLY FAVORABLE decision issued on August 4, 2011, as well as the October 23, 2013 cessation determination.  For . . . purposes of this decision, the undersigned denies the claimant's request to reopen the earlier initial decision and subsequent cessation determination.  For whatever reason, the claimant–who is represented by counsel–continues to allege a disability onset date of January 15, 2010 (despite the fact she was previously established as disabled through October 22, 2013).  For . . . purposes of this decision, the [ALJ] addresses a period of adjudication commencing as of October 23, 2013.  Any discussion herein of evidence falling within the previous adjudicated period is to provide a historical context.
(Tr. 12.)

[3] Plaintiff had to establish disability on or before December 31, 2018, her date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 13.)

Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff's first argument on appeal is that the ALJ erred in finding that Plaintiff's mental impairments were not severe at step two of the sequential evaluation process.[4] Plaintiff explains that this is significant because a finding of

---

[4] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 404.1520(a)(4).

a severe mental impairment typically leads to a restriction for unskilled work, which would have eliminated Plaintiff's past relevant work because it was either skilled or semi-skilled.  Plaintiff adds that when a claimant, like her, who is over the age of 50, is limited to unskilled sedentary[5] work and cannot perform her past relevant work, she is presumed to be disabled pursuant to the Medical-Vocational Guidelines (the Grids).  Plaintiff's second argument is that the ALJ's decision is not supported by substantial evidence because the ALJ made the following misrepresentations or assumptions: (1) that Plaintiff continued to allege a disability onset date of January 15, 2010; (2) that Plaintiff's ability to hold a dog indicated greater physical abilities than alleged; and (3) that Plaintiff's husband's statement that Plaintiff was legally blind was inconsistent with the medical records.  Finally, Plaintiff argues that the ALJ erred in failing to weigh the statements of her husband, Mr. Bullard, pursuant to SSR 06-03p and 20 C.F.R. § 404.1513.  The undersigned does not find any reversible error.

Turning to the first issue, in the Eleventh Circuit, "[t]he finding of any severe impairment . . . is enough to satisfy step two because once the ALJ proceeds beyond step two, he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." *Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 902 (11th Cir. 2011). Therefore, even if the ALJ erred by finding Plaintiff's mental impairments to be

---

[5] Here, the ALJ found that Plaintiff was limited to a reduced range of sedentary work.  (Tr. 18.)

4

non-severe, the error would be harmless because the ALJ found at least one severe impairment.  *See Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824-25 (11th Cir. 2010) (per curiam) ("Even if the ALJ erred in not indicating whether chronic pain syndrome was a severe impairment, the error was harmless because the ALJ concluded that [plaintiff] had a severe impairment: [sic] and that finding is all that step two requires.  . . .  Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe.").

At step two, the ALJ found that Plaintiff had the following severe impairments: "diabetes, along with chronic kidney disease and neuropathy; bilateral carpal tunnel syndrome and ulnar nerve neuropathy; bilateral Dupuytren's, right worse than left, with recent surgery; a history of degenerative disc disease in the cervical and lumbar spine and osteoarthritis of the left knee; mild, intermittent asthma; and[] obesity."  (Tr. 15.)  The ALJ expressly addressed Plaintiff's history of depression, anxiety, panic attacks, reported trouble dealing with tasks, fits of anger and frustration, alleged cognitive impairment, impulse control disorder, and difficulties concentrating and focusing, as well as the reports of her husband that she experienced emotional outbursts, volatile mood swings, significant issues handling stress and/or changes in routine, and that she needed reminders to do things and go places.  (*See* Tr. 15-18.)  The ALJ provided specific reasons for finding these impairments to be non-severe.  (*See id.*)  Starting with Plaintiff's husband's reports, the ALJ stated:

Mr. Bullard's reports of limited day-to-day abilities focus, in large

part, on the claimant's physical health issues (as opposed to depression and/or anxiety). He also admitted the claimant had never been fired or laid off in the past due to difficulties getting along with others (Exhibits 3E and 6E). At [the] hearing, the claimant confirmed the reports at Exhibit 34F indicating she was "active in her church . . . working on social justice issues." The claimant testified she was participating in a Pinellas County program entitled FAST (Faith and Action for Strength Together), a program assisting youthful offenders within the juvenile justice system. The fact the claimant volunteered for these endeavors and apparently participated in such work tends to discount claims of limiting mental health symptomatology (with difficulties dealing with stress and the like). The claimant also confirmed the reports at Exhibit 34F that she had recently traveled to Chicago, Illinois, for six weeks. At Exhibit 5F and 30F, the evidence further shows the claimant has traveled to Delaware and was going to exercise at a local gym during the relevant period. Hence, this only further shows greater abilities than alleged. At Exhibit[s] 16F and 29F, the record hints at issues of marital discord during the relevant period, though the claimant has not submitted evidence that these issues led to domestic scenes requiring local authorities or similar interventions, which discounts some of the claimant's claims of fits of anger and frustration.

(Tr. 15-16.)

The ALJ then addressed the medical evidence showing a history of depression and anxiety, including the July 2013 consultative psychological examination by Linda Appenfeldt, Ph.D., based on which the ALJ concluded that Plaintiff was not "battling significant mental health issues in the summer of 2013." (Tr. 16.) Further, the ALJ noted there was "little evidence of mental health concerns, let alone treatment, throughout the rest of 2013, as well as all of 2014 and 2015," and there was "nothing from an 'acceptable medical source' specializing in such disorders." (*Id.*) Then, the ALJ observed that "the record evidence through 2016 consist[ed] largely of mere mentions of depression and

anxiety in primary care provider records, with little elaboration (Exhibits 7F, 10F, 20F, 21F, and 23F)."  (Tr. 16.)  The ALJ noted Dr. Appenfeldt's second examination, which took place in March 2016 and showed that Plaintiff "seemed capable of performing mental activities 'involving social interaction, understanding, adaptation, memory, sustained concentration, and persistence.'"  (*Id.*)  The ALJ stated, "by April 2016, the claimant had seen Dr. Appenfeldt *twice*, and this examining source noted little of significance."  (*Id.* (emphasis in original).)  He added that Plaintiff's primary care providers also "noted little of significance."  (*Id.*)

Turning to the treatment records from Angelo Alves, M.D., a specialist in neurology and neuropsychiatry, the ALJ noted reports of memory deficits, loss of attention and focus, other cognitive issues, and a history of an impulse control disorder, as well as an abnormal EEG and MRI of the brain.  (*Id.*)  The ALJ stated:

> While Dr. Alves'[s] notes focus, in large part, on physical health concerns, the tenor of these notes also suggest[s] disabling mental health issues.  Yet, the [ALJ] weighs these notes with the other, contrary findings from Dr. Appenfeldt and the other sources discussed above, as well as the nonmedical evidence discussed herein.  Dr. Alves'[s] records do not necessarily support a finding of severe mental impairments, particularly when weighing the rest of the evidence as a whole.
>
> Indeed, in 2017, the primary care providers continued to note rather benign mental health issues (Exhibits 23F, 26F, 27F, 28F, 30F, and 32F).
>
> By the summer of 2017, the claimant was finally getting treatment for mental health matters at Florida Behavioral Medicine.

> She was diagnosed with major depression, though it does not appear that the diagnosis comes from an "acceptable medical source" . . . .  For that matter, and while the claimant was "depressed," she was also "cooperative" and "calm." She was oriented times four and with "organized" thought processes. Thought content was "intact," as were recent and remote memory skills.  Insight and judgment were at least "fair," as was attention and concentration (Exhibits 29F and 24F).

(Tr. 16-17.)

Then, the ALJ discussed other non-medical evidence, including the January 2016 report of a Social Security claims representative who conducted a teleclaim interview of Plaintiff and noted no apparent issues understanding, answering questions, or concentrating.  (Tr. 17.)  The ALJ "observed similar abilities at the February 2018 hearing" where Plaintiff "exhibited no apparent social deficits and maintained a proper sense of decorum."  (*Id.*)

The ALJ found that Plaintiff's "medically determinable mental impairments, considered singly and in combination, [did] not cause more than minimal limitation in [her] ability to perform basic mental work activities and [were] therefore nonsevere."  (*Id.*)  Based on the medical and non-medical evidence, the ALJ determined that Plaintiff had a mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing herself.  (*Id.*)  The ALJ explained that "[t]he medical and nonmedical evidence, discussed above, does not align with a finding of a moderate or greater limitation in any of these areas of functioning."  (*Id.*)

The ALJ added:

> In arriving at this finding, the [ALJ] notes that the claimant has submitted little treating opinion from a mental health "acceptable medical source" suggesting greater limitations . . . .  To be sure, Dr. Alves opined the claimant had mental impairments that included a cognitive disorder and impulse control disorder, with limitations and a conclusion the claimant was "totally and permanently disabled" (Exhibits 15F and 16F), but the undersigned notes that the opinion is conclusory, the provider only saw the claimant for a brief period in 2016, and the medical and *nonmedical* evidence does not align with such significant limitations.  The [ALJ] therefore gives more weight to the opinion from Dr. Appenfeldt at Exhibit 11F, as well as the State agency assessments at Exhibits 3A and 5A as they rely on a consideration of the medical and *nonmedical* evidence and come with more detailed analyses as to why the claimant has no severe mental impairments.

(Tr. 17-18 (emphasis in original).)

Further, in determining the RFC, the ALJ acknowledged Plaintiff's allegations of mental health issues, but reiterated that Plaintiff had shown "little support for a finding of severe mental impairments."  (Tr. 19-20.)  In evaluating Dr. Alves's opinions, the ALJ noted the doctor's "concern for mental health problems," but repeated that the evidence did not support a finding of severe mental impairments.  (Tr. 21; *see also* Tr. 23 (giving little weight to the opinions of Drs. Alves and Moukaddem because "the opinions rely–at least in part–on mental health issues that the [ALJ] has already found to be nonsevere (let alone disabling)").)  Further, the ALJ stated: "While the regulations at 20 CFR [§] 404.1545(e) require adjudicators to consider both severe and nonsevere impairments in formulating the residual functional capacity, the nonsevere impairments result in no greater limitations than those already arrived at herein."

(Tr. 22; *see also* Tr. 23 ("All other nonexertional limitations also account for the other medically determinable severe and nonsevere impairments in the record.").)

As shown by the ALJ's decision, he adequately considered all of Plaintiff's impairments, both severe and non-severe, in combination (Tr. 15-24). *See Tuggerson-Brown v. Comm'r of Soc. Sec.*, No. 13-14168, 572 F. App'x 949, 951-52 (11th Cir. 2014) (per curiam) ("[T]he ALJ stated that he evaluated whether [plaintiff] had an 'impairment or combination of impairments' that met a listing and that he considered 'all symptoms' in determining her RFC.  Under our precedent, those statements are enough to demonstrate that the ALJ considered all necessary evidence.").

Moreover, the ALJ's findings are supported by substantial evidence.  The ALJ correctly noted that in the Function Report, Plaintiff's husband focused, in large part, on her physical, rather than mental issues and marked the box indicating that Plaintiff had never been fired or laid off from a job due to difficulties getting along with others.  (*See* Tr. 243-50.)  Plaintiff seems to launch a piecemeal attack on the ALJ's decision, but the Court's role is to determine whether the ALJ's findings are based on correct legal standards and supported by substantial evidence.  The undersigned finds that they are.

The record also supports the ALJ's observation that Plaintiff was active in her church, was working on social justice issues, was exercising at a local gym, had recently traveled to Illinois and Delaware for weeks at a time, and had

exhibited no apparent social deficits or issues with concentration or comprehension during her administrative hearing before the ALJ or during her teleclaim interview in January 2016, all of which tended to discount her claims of mental limitations.[6]  (*See, e.g.*, Tr. 37-70, 56-60, 88, 908, 992, 1018.)  Moreover, the ALJ correctly observed that there was limited evidence of mental health concerns during the relevant period of time because the progress notes from the primary care providers reflect generally benign examination findings and mere diagnoses of depression and anxiety.[7]  (*See, e.g.*, Tr. 393-94, 402, 406, 410, 414, 418, 422, 426, 430, 434, 438, 442, 446, 454, 458, 493, 497, 501, 508, 512, 516, 520, 524, 528, 532, 540, 587-88, 596-98, 727, 731, 735, 743, 746, 750, 754,

---

[6] The ALJ also stated that there was no evidence that Plaintiff's marital discord had "led to domestic scenes requiring local authorities or similar interventions," which allegedly undermined Plaintiff's "claims of fits of anger and frustration."  (Tr. 16.)  It appears that the ALJ was expecting to see evidence substantiating Plaintiff's testimony at the hearing that the police were called to her house when her husband claimed that she had hit him.  (Tr. 48.)  While such corroborating evidence was certainly not necessary to decide Plaintiff's claim for disability benefits, this statement, by itself, does not undermine the ALJ's findings, which are otherwise supported by substantial evidence.

In any event, Plaintiff's fits of anger are noted in Dr. Appenfeldt's July 9, 2013 and March 21, 2016 consultative reports.  (*See* Tr. 370 ("She acknowledged anger.  She commented, 'More cussing.  I have hit my husband.  I threw a water bottle at him. . . .'"); Tr. 551 ("She explained her husband called the police in November 2015 to the residence as he 'felt threatened.'  She stated there had been [an] argument."); *see also* Tr. 404 ("[Plaintiff] had a conflict with her husband last weekend as apparently she was not taking her medications and that le[d] to an argument with her husband.").)

[7] Some of the progress reports from the treating sources were not authored by an acceptable medical source as defined in 20 C.F.R. § 404.1502(a), and the ALJ correctly observed that there was "nothing from an 'acceptable medical source' *specializing* in [mental health] disorders."  (Tr. 16 (emphasis added); *see also* Tr. 736-40, 822-25, 855-56, 896-900, 1017-19.)

758, 817, 964, 968, 972, 975; *see also* Tr. 815 (noting that Plaintiff was alert, oriented, and cooperative, with good eye contact and intact cognitive function); Tr. 872, 876, 881, 909, 918 & 957 (noting a normal mental status examination).)[8]

Also, as the ALJ stated, the two consultative psychological examinations by Dr. Appenfeldt showed little of significance.[9]  (Tr. 368-71, 549-52 (reflecting an essentially normal mental status examination, except when Plaintiff "discussed stressors related to her health," she "appeared mildly depressed").) Dr. Appenfeldt's March 21, 2016 report indicated that Plaintiff's "emotional and psychological prognosis, with appropriate interventions, [was] considered to be good."  (Tr. 551.)  Despite the essentially normal mental status examination, Dr. Appenfeldt diagnosed Plaintiff with an adjustment disorder with depressed mood, but cautioned: "The most accurate diagnosis for this claimant would be obtained

---

[8] The ALJ also noted that Plaintiff's primary care providers indicated "concerns with medication and treatment compliance."  (Tr. 21.)  The record confirms that when Plaintiff was taking her medications correctly and consistently, she experienced depression only occasionally.  (*See* Tr. 48; *see also* Tr. 408 ('[Plaintiff] is doing better and is taking her medications more consistently now."); Tr. 416 ("[Plaintiff] has not been doing that well as she has not taken any of her medications in the last week."); Tr. 810 ("Depakote is controlling her mood well."); Tr. 888-89 (taking medications but not as prescribed).)

[9] In the Summary portion of her July 9, 2013 report, Dr. Appenfeldt opined: [Plaintiff] is capable of simple, repetitive tasks and unskilled work.  She is also able to perform work related mental activities involving understanding, memory, sustained concentration and persistence, social interaction, and adaptation.  . . .  Regarding her daily functioning, she appears to be capable of attending to, following and understanding directions.  She appears to have the ability to ask questions and appropriately request assistance.
(Tr. 371.)

from multiple sources and settings, including complete history.  Therefore,

additional review of all records is advised."  (*Id.*)  In the Summary portion of her

March 21, 2016 report, Dr. Appenfeldt opined:

> In evaluating Mrs. Bullard's ability to perform work related
> activities, she is able to hear, speak, walk, sit, stand, handle objects,
> and ride in a motor vehicle.  In addition, she is capable of simple,
> repetitive tasks and unskilled work.  She is also able to perform work
> related mental activities involving social interaction, understanding,
> adaptation, memory, sustained concentration and persistence.[10]

(Tr. 552.)

In addition, Plaintiff treated with Dr. Alves for a brief period in 2016.[11]  (*See*

Tr. 555.)  However, as the ALJ observed, Dr. Alves's opinion of disabling

limitations was conclusory[12] and inconsistent with the reports of other medical

---

[10] To the extent Plaintiff argues that the ALJ erred when he did not incorporate
Dr. Appenfeldt's opinion that Plaintiff could perform unskilled work into the residual
functional capacity ("RFC") assessment, the ALJ's RFC assessment did not need to
mirror or match the findings or opinions of any particular medical source because the
final responsibility for assessing the RFC rests with the ALJ.  *See* 20 C.F.R. §
404.1527(d)(2); *Kopke v. Astrue*, 2012 WL 4903470, *5 (M.D. Fla. Sept. 26, 2012)
(report and recommendation adopted by 2012 WL 4867423 (M.D. Fla. Oct. 15, 2012)).
Here, the ALJ properly considered the evidence of record and his RFC assessment is
supported by substantial evidence.  In reaching this conclusion, the undersigned has
considered the district court decisions cited in Plaintiff's Reply Brief, which are not
binding on this Court and are, in any event, inapposite, because the ALJ did not base
his decision solely on the opinions of non-examining, reviewing medical sources and the
ALJ found Plaintiff not disabled at step four, rather than at step five, of the sequential
evaluation process.  As reflected in the ALJ's decision, he considered Plaintiff's
impairments and incorporated into the RFC assessment only those limitations resulting
from the impairments, which he found to be supported by the record.  Therefore, to the
extent Plaintiff suggests that the RFC assessment is incomplete, her suggestion is
rejected.

[11] There are also some older records predating the relevant period under review.
(*See, e.g.*, Tr. 608-59.)

[12] On June 9, 2016, Dr. Alves stated, in relevant part:

sources (such as Dr. Appenfeldt) and the non-medical evidence.  On April 27, 2016, Dr. Alves diagnosed Plaintiff with, *inter alia*, an impulse control disorder due to "difficulty controlling her anger sometimes, which ha[d] been causing significant problems in her relationship with her husband" and mild memory loss with cognitive impairment, but noted that Plaintiff was still able to take care of

_____

> The patient has multiple medical and neurological conditions which definitely qualify her for total and permanent disability under the Social Security Administration Program, and therefore in my opinion, her request for reestablishing her disability should be granted immediately because she deserves it and there is no way in the world that this lady is going to go back to work in any capacity in the future due not only to her multiple physical conditions but also due to her major depressive disorder with anxiety, and of course some memory and cognitive issues as well.

(Tr. 598; *see also* Tr. 597.)  On August 16, 2016, Dr. Alves essentially repeated his opinion by stating:

> There is no doubt in this case that this lady is totally and permanently disabled for any kind of full employment as she is not expected to improve in her lifetime and in my opinion her course is going to be progressive for the worse, and therefore, she should be entitled right away to Social Security benefits that were taken away recently for no reason and just because she apparently got slightly better after she had the left eye surgery, which really makes no sense as far as cutting her off from what she deserves.  . . .  I reiterate the fact that she is considered as total impairment disabled for any kind of gainful employment.

(Tr. 588.)  The ALJ gave little weight to Dr. Alves's conclusion of total and permanent disability "because it is just that—a conclusion that comes with little support and no way of knowing whether Dr. Alves is aware what 'disabled' means under the Social Security Act."  (Tr. 23.)  The ALJ did not err in discounting Dr. Alves's conclusion, which is on an issue reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(1), (d)(3) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.  . . .  We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.").

herself in activities of daily living.  (Tr. 557.)  He prescribed Depakote for mood

stabilization and other conditions, and continued Plaintiff's prescription for

Clonazepam and Effexor XR.  (Tr. 558.)  At the follow-up on June 9, 2016, Dr.

Alves added that Plaintiff "suffer[ed] from major depressive disorder together with

generalized anxiety for which she [was] on both antidepressant and anti-anxiety

medications."  (Tr. 597; *see also* Tr. 596, 598.)  On August 16, 2016, Dr. Alves

noted that Depakote had really helped; specifically, as far as the mood

stabilization, Plaintiff felt much better, less impulsive, and much calmer.  (Tr.

586.)  As far as her mild cognitive impairment, Plaintiff had "few memory and

cognitive issues from time to time and sometimes she need[ed] redirecting in

order to get back on track."  (Tr. 586; *see also* Tr. 587-88.)  Dr. Alves reiterated

that Plaintiff suffered from a major depressive disorder and generalized anxiety

disorder, for which she was treated with medication.  (Tr. 587-88.)

The ALJ acknowledged that Dr. Alves's records suggested Plaintiff "had

certain, significant functional limitations," but the ALJ stressed that "this evidence

stands on an island isolated to a brief interval of less than 12 months in 2016."

(Tr. 22.)  The ALJ added: "Otherwise, *many* primary care providers identified

relatively modest signs/findings on examination.  This evidence seems more

consistent with the claimant's abilities, versus the brief interventions offered by

Dr. Alves."  (*Id.* (emphasis in original).)  The ALJ's findings as to Dr. Alves's

opinions are supported by substantial evidence and to the extent Plaintiff argues

that the ALJ improperly weighed these opinions, Plaintiff's argument is rejected.

The ALJ gave little weight to Dr. Alves's opinions because the doctor relied, at least in part, on mental health issues that the ALJ found to be non-severe, let alone disabling.  (Tr. 23.)

Turning to Plaintiff's second argument, the undersigned does not find any misstatements and/or assumptions by the ALJ that warrant a reversal.  First, although Plaintiff takes issue with the ALJ's statement that Plaintiff, "who is represented by counsel[,] continues to allege a disability onset date of January 15, 2010 (despite the fact she was previously established as disabled through October 22, 2013)" (Tr. 12), it is undisputed that Plaintiff never actually amended her alleged disability onset date.  Although Plaintiff's attorney indicated his intent to amend the onset date in his February 8, 2018 letter to Chief Judge Dent, he never amended the date and did not follow up on this issue either at or following the February 20, 2018 hearing.  (*See* Tr. 333 ("She previously received benefits for a date of onset of January 15, 2010.  . . .  They discontinued her for medical improvement.  I cannot find the explanation in the electronic file.  She failed to appeal properly and the termination became permanent.  She made a new application January 14, 2016.  She believed she became disabled January 15, 2010.  We will amend the onset date.  I would prefer to wait and see if you can tell us when the termination occurred."); *see also* Tr. 208.)

Second, Plaintiff takes issue with the ALJ's statement that her ability to hold a dog indicated greater physical abilities than alleged.  The ALJ made this statement when addressing the treatment records of Dr. Moukaddem.  (*See* Tr.

21 (stating that Dr. Moukaddem "noted the fact that, in July 2016, the claimant injured herself when a dog she was holding jumped out of her arms (connoting the fact the claimant's physical abilities with lifting/carrying may have been greater than she alleged)"); Tr. 741 ("Here for evaluation of right thumb pain and mild swelling for the last [two] weeks.  She was holding a dog and [sic] jumped abruptly out of her hand.  She is having difficulties with opening bottles.").)  According to Plaintiff, "the ALJ is making assumptions without any support in the record" as he never asked how much the dog weighed.  (Doc. 19 at 30.)  Plaintiff's counsel speculates in his brief before the Court that the dog may have been five pounds (*id.*), despite counsel's statement to the Appeals Council on June 22, 2018 that the dog weighed between nine and ten pounds.  (S*ee* Tr. 338 ("I spoke to Ms. Day-Bullard and she indicated that the dog that was in her arms as described in the brief was between nine and ten pounds.").)  Furthermore, in her Supplemental Cardiac Questionnaire, Ms. Bullard stated, in relevant part: "Now I can sometimes lift our dog who weighs 10 pounds again.  When she weighed 15 [pounds,] I kept dropping her so I had to stop."  (Tr. 307.)  As such, there is substantial evidence in the record to support the ALJ's finding that Plaintiff had the RFC to perform a reduced range of sedentary work, including the ability to lift/carry ten pounds.  (Tr. 18, 23.)

Next, Plaintiff argues that there is no substantial evidence in the record to support the ALJ's finding of inconsistency between Mr. Bullard's January 24, 2016 Function Report, which indicated, in relevant part, that Plaintiff was legally

17

blind (Tr. 246), and the medical records.  The ALJ correctly noted that Mr. Bullard's statements were not fully consistent with the medical and other evidence of record.  (*See* Tr. 19, 21.)  The ALJ's decision indicates that he was fully aware of Plaintiff's vision issues.  (*See* Tr. 19 ("Her husband, Mr. Bullard, indicated the claimant was 'legally blind[.]'"); Tr. 20 ("[T]he 2015 treatment evidence references care for vision issues, including cataracts and diabetic retinopathy.  Notwithstanding, these same records—while noting some deficits—still showed functional visual acuity[.]"); Tr. 21 ("Aside from Drs. Moukaddem, Stanford, Talati, etc., the claimant also saw various doctors for her vision issues, as reflected in the records at Exhibits 6F, 8F, 9F, 13F, and 22F.  However, visual acuity was still at 20/40 with both eyes.  Jason M. Handza, D.O., noted in June 2016, September 2016, and December 2016 that, 'yes,' the claimant was still driving (Exhibit 22F).  Such objective medical assessments are hardly consistent with the January 2016 report by the claimant's husband, James Bullard, that the claimant was legally blind (Exhibit 3E)."); Tr. 22 ("Moreover, the claimant's vision problems do not represent a severe impairment, as she has retained functional visual acuity and proven capable of activities of daily living that include driving.").)

Moreover, the ALJ's findings as to Plaintiff's vision are supported by substantial evidence.  Without correction, Plaintiff's vision was 20/200 and 20/400, but with correction it was typically 20/25 in both eyes, or 20/40 and 20/60, respectively.  (*See, e.g.*, Tr. 473-75, 569-80; *see also* Tr. 798, 801 & 805

(noting Plaintiff was driving)[13].)  The records that Plaintiff cited in her brief

showed her *uncorrected* vision.  (*See* Tr. 569, 573.)

Finally, Plaintiff argues that the ALJ erred in failing to weigh the statements

of Plaintiff's husband.  The undersigned does not find any reversible error in the

ALJ's evaluation of Mr. Bullard's statements.  First, the ALJ's decision indicates

that he obviously considered Mr. Bullard's statements starting at step two of the

sequential evaluation process.  (*See* Tr. 15, 19, 21, 22-23.)  Moreover, as part of

his credibility findings, the ALJ determined that Plaintiff's "statements, *as well as*

*those from Mr. Bullard*, concerning the intensity, persistence, and limiting effects

of [her] symptoms [were] not entirely consistent with the medical evidence and

other evidence in the record."  (Tr. 19 (emphasis added).)  Plaintiff does not

seem to challenge the ALJ's assessment of her credibility.  Further, Mr. Bullard's

statements "largely corroborated Plaintiff's testimony."  *Harrington v. Astrue*, No.

8:08-cv-1702-T-TBM, 2009 WL 3232347, *7 (M.D. Fla. Sept. 29, 2009).  Thus,

even assuming the ALJ did not explicitly weigh Mr. Bullard's statements, "the

explicit credibility determination as to Plaintiff's testimony sufficiently implies a

rejection of [her husband's] testimony as well."  *Harrington v. Astrue*, No. 8:08-cv-

1702-T-TBM, 2009 WL 3232347, *7 (M.D. Fla. Sept. 29, 2009); *see also De*

---

[13] Plaintiff testified at the February 20, 2018 hearing that she drove.  (Tr. 51.)
Also, in her Supplemental Pain Questionnaire, Plaintiff explained that she lost sight in
her left eye in November 2015 due to a retinal bleed, but regained it after cataract
surgery in January 2016 and another surgery for the removal of blood in February 2016.
(Tr. 313.)

*Olazabal v. Soc. Sec. Admin.*, 579 F. App'x 827, 832 (11th Cir. 2014) (per curiam) ("Because it was cumulative of the other evidence in the record and . . . the ALJ properly considered the medical evidence in the record and [plaintiff's] own testimony, the fact that the ALJ did not separately discuss [plaintiff's husband's] report or provide specific reasons for not relying upon it is harmless."); *Osborn v. Barnhart*, 194 F. App'x 654, 666 (11th Cir. 2006) (per curiam) (concluding that "the ALJ's specific and explicit credibility determination as to Osborn's testimony sufficiently implies a rejection of [his wife's] testimony as well").  Thus, Plaintiff's final argument is also rejected.

## III.    Conclusion

The Court does not make independent factual determinations, re-weigh the evidence, or substitute its decision for that of the ALJ.  Thus, the question is not whether the Court would have arrived at the same decision on *de novo* review; rather, the Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence.  Based on this standard of review, the Court concludes that the ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act for the time period in question should be affirmed.

Accordingly, it is respectfully **RECOMMENDED** that:

1.    The Commissioner's decision be **AFFIRMED**.

2.    The Clerk of Court be directed to enter judgment accordingly, terminate any pending motions, and close the file.

**DONE AND ENTERED** at Jacksonville, Florida, on February 20, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Steven D. Merryday
United States District Judge

Counsel of Record